Per Curiam:
This case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Kule 134(h). The commissioner has *299 done so in an opinion and report filed on October 21, 1971. Plaintiff filed exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law and defendant urged the court to adopt them as the basis for its judgment in the case. Plaintiff’s motion to submit the case to the court without oral argument has been allowed and the case has been submitted to the court on the briefs of the parties without oral argument of counsel.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, with minor corrections in the findings, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OPINION OP COMMISSIONER
White, Commissioner:
The plaintiff contends in this case that the Immigration and Naturalization Service (“the Service”) of the U.S. Department of Justice breached a negotiated contract which the Service and the plaintiff entered into on May 29,1968, for the fiscal year 1969. According to the petition, the Service breached the contract “by utilizing * * * other private concerns to perform routine and daily pre-flight inspections” on Service-operated aircraft, instead of calling on the plaintiff to perform such inspections under the contract previously mentioned. The petition alleges that the inspections in question were improperly procured by the Service during the period September 1968-June 1969, that they numbered at least 126, and that they were procured by the Service principally from a firm located in El Centro, California.
It is my opinion that the contract in question was not breached by the Service, and, accordingly, that the plaintiff is not entitled to recover in the present action.
A routine daily and preflight inspection is a service which a passenger-carrying aircraft is required by the Federal Aviation Begulations to receive from qualified personnel within the 24-hour period immediately preceding any take-off *300 on a flight. The purpose is to determine the airworthiness of the aircraft. In the conduct of such an inspection, there are, on most occasions, repairs or other services to the aircraft which are related to, or accomplished as incidents to, the inspection by the personnel conducting the inspection, and for which an additional charge is made if the inspection and related work are performed by an independent private concern.
The plaintiff is a Texas corporation. Its business is the inspection, repair, overhaul, modification, refurbishing, and servicing of aircraft that weigh 12,500 pounds or more. The plaintiff operates a facility at Brownsville, Texas, and another facility at El Paso, Texas. Both of these facilities are FAA certified repair stations. The 1969 contract that is involved in the present litigation covered the performance by the plaintiff’s El Paso station of work on aircraft operated by the Service.
At the time when the contract for 1969 was entered into, and throughout the fiscal year 1969, the Southwest Region of the Service had three passenger-carrying aircraft based at El Paso, Texas — a DC-6A with a 97-passenger capacity, a Convair 340-440 with a 50-passenger capacity, and another Convair 340-440 with a 44-passenger capacity.
When the contract for 1969 was negotiated, and continuing through the first half of the fiscal year 1969, the aircraft mentioned in the preceding paragraph were operating regularly out of El Paso, Texas, and were being used by the Service principally in an air-lift of illegal Mexican immigrants from San Diego, California, and El Centro, California, to El Paso. Many Mexican immigrants had illegally crossed into Arizona and Southern California to work on farms in those areas, and substantial numbers of them had then gone into Northern California, Oregon, and Washington in search of further employment. When illegal Mexican immigrants were apprehended in Arizona, California, or the Pacific Northwest, they were generally assembled in San Diego, California, or El Centro, California, and from those places they were transported in Service-operated aircraft to El Paso, Texas. From El Paso, the illegal Mexican immi *301 grants were returned to Mexico through Juarez, and then were transported into the interior of Mexico by means of a Mexican-operated air-lift, train-lift, or bus-lift.
The air-lift from San Diego, California, and El Centro, California, to El Paso, Texas, as described in the preceding-paragraph of this opinion, turned out to be financially very burdensome to the Service, in the light of the funds available to it for the fiscal year 1969. As a means of saving expenses, the Service discontinued this air-lift at about the beginning of September 1968 and substituted for it a bus-lift, which involved the transportation of illegal Mexican immigrants in Service-operated buses from points in Arizona, California, and the Pacific Northwest to Andrade, California, where the illegal Mexican immigrants were transferred to Mexican-operated buses for transportation into the interior of Mexico. This bus-lift was continued throughout the remainder of the fiscal year 1969 (and up imtil the time of the trial in June of 1971).
As a result of the discontinuance of the air-lift from San Diego and El Centro to El Paso, there was no longer any great need during the remainder of the fiscal year 1969 for the Service’s aircraft on passenger-carrying flights to or from El Paso, and such aircraft and their crews were idle much of the time. This adversely affected the amount of work that the plaintiff would otherwise have been called upon to perform at El Paso on the Service’s aircraft under the contract for the fiscal year 1969.
The number of illegal Mexican immigrants apprehended in Northern California and the Pacific Northwest proved to be too great for the Service-operated bus-lift to be able to handle their transportation to the Mexican border with reasonable expedition. As a consequence, the Service adopted a plan in September of 1968 whereby, for the remainder of the fiscal year 1969, the Service’s two Convair 340-440’s and their crews were, with substantial regularity, detailed on a rotating basis from El Paso, Texas, to El Centro, California, for the purpose of supplementing the Service’s bus-lift.
*302 Under the plan of rotation, a Convair 340-440 and its crew would leave El Paso, Texas, on a Monday morning and would proceed to El Centro, California, on a detail lasting through Friday of the particular week. The aircraft would operate during the 5-day detail out of the El Centro Naval Air Station and would be used in the transportation of illegal Mexican immigrants from points in Northern California and the Pacific Northwest to El Centro, from which place the illegal immigrants were transported in Service-operated buses to Andrade, California, for transfer to Mexican-operated buses so that they could be transported into the interior of Mexico. The members of the aircraft crew were in a travel status, and received a per diem allowance in lieu of subsistence, during the 5-day detail. At the end of the 5-day detail, the crew would fly the aircraft back to El Paso. Then, on the following Monday, the other Convair 340-440 and its crew would generally be detailed from El Paso to El Centro for a 5-day period.
On a few occasions, when its greater carrying capacity was needed for the transportation of illegal Mexican immigrants from Northern California or the Pacific Northwest to El Centro, the Service’s DC-6A and its crew were temporarily detailed from El Paso to El Centro.
During the 5-day details of the Service’s aircraft from El Paso, Texas, to El Centro, California, as outlined m the two immediately preceding paragraphs, it was necessary for such aircraft to receive routine daily and preflight inspections, since a passenger-carrying aircraft must receive such an inspection from qualified personnel within the 24-hour period immediately preceding any take-off on a flight. Such inspections were procured by the Service in El Centro from Ken Bemis Aircraft Service, a private concern with which the plaintiff had no connection. On each occasion, the routine daily and preflight inspection was procured on an ad hoc basis by the pilot in command of the affected aircraft, utilizing for this purpose delegated authority to procure needed goods and services costing $500 or less, without entering into a formal contract.
*303 The Service procured 129 routine daily and preflight inspections from Ken Bemis Aircraft Service during the period September 1968-June 1969. The Service paid Ken Bemis Aircraft Service a total of $14,461.46 for services performed during the fiscal year 1969, and most of this money was paid for the routine daily and preflight inspections previously mentioned.
As the plaintiff, under the 1969 contract with the Service, had the responsibility of maintaining the log books for the Service’s aircraft, the plaintiff became aware when the Service’s aircraft returned to El Paso, Texas, from El Centro, California, for weekends that Ken Bemis Aircraft Service had performed routine daily and preflight inspections on such aircraft. Beginning in October 1968, the plaintiff complained to the Service on several occasions that the actions of the Service in procuring routine daily and preflight inspections on the Service’s aircraft from Ken Bemis Aircraft Service amounted to violations of the 1969 contract. It was the plaintiff’s position that the 1969 contract required the Service to return its aircraft to the plaintiff’s El Paso station for each required routine daily and preflight inspection, irrespective of where a particular aircraft might be operating at any given time. On the other hand, representatives of the Service took the position consistently that the procuring of routine daily and preflight inspections from Ken Bemis Aircraft Service during the 5-day periods when the Service’s aircraft were detailed to El Centro, California, did not breach the 1969 contract.
The controversy between the parties could not be resolved administratively, and the plaintiff instituted the present court action for alleged breach of contract.
The contract between the Service and the plaintiff for the fiscal year 1969 covered the “repair, maintenance * * *, servicing and inspection of G'overnment-owned aircraft and components at El Paso, Texas, in strict accordance with the terms, conditions and specifications of this * * * [contract], during the period July 1, 1968 through June 30, 1969.” It prescribed a schedule of hourly rates that were to be paid by the Service to the plaintiff for various types of work *304 which the plaintiff was to perform under the contract, and provided that parts were to be furnished to the Service by the plaintiff at the latter’s acquisition cost. Both parties to the present litigation are in agreement that the performance of routine daily and preflight inspections was within the scope of the 1969 contract.
The plaintiff argues that, during the 5-day details of the Service’s aircraft to El Centro, California, the Service was required by the 1969 contract to return its aircraft to the plaintiff’s El Paso station for each required routine daily and preflight inspection, instead of procuring such daily inspections in El Centro from Ken Bemis Aircraft Service, because one of the special conditions of the contract stated in part as follows:
* * * It is understood and agreed that the Government will order from the contractor all of such services and/or supplies called for in this contract, as there may be need for, during the contract period. * * *
The contractual provision quoted in the preceding paragraph plainly obligated the Service to procure from the plaintiff’s El Paso station “all * * * services * * * called for in this contract, as there may be need for”; but the “services * * * called for in this contract” were the “repair, maintenance * * *, servicing and inspection of Government-owned aircraft and components at El Paso, Texas” [emphasis supplied]. In this connection, the evidence in the record shows that the Service did procure from the plaintiff’s El Paso station not only all the routine daily and preflight inspections, but also all other work, needed by the Service’s aircraft “at El Paso, Texas,” during the fiscal year 1969.
Actually, the plaintiff has not been consistent in its construction of the provision in the 1969 contract which required the Service to procure from the plaintiff’s El Paso station “all * * * services * * * called for in this contract, as there may be need for.” During the fiscal year 1969, the Service’s aircraft happened to be in Brownsville, Texas, on five separate occasions when they required routine daily and pre-flight inspections. On each occasion, the* routine daily and *305 preflight inspection was procured by the Service from the plaintiff’s Brownsville station. Neither the plaintiff nor the Service regarded such work as being covered by the provisions of the 1969 contract. Instead, the inspection service needed in Brownsville ivas procured each time on an ad hoc basis by the pilot in command of the particular aircraft, utilizing for this purpose delegated authority to procure needed goods and services costing $500 or less, without entering into a formal contract.
Also, if the plaintiff were cori’ect in its present contention that the 1969 contract required the Service to return its aircraft to the plaintiff’s El Paso station for all routine daily and preflight inspections needed by the Service’s aircraft, the 1969 contract would similarly have required the Service to return its aircraft to the plaintiff’s El Paso station for all other “repair, maintenance * * *, servicing and inspection” work needed by such aircraft. In this connection, the evidence in the record shows that during the fiscal year 1969 the Service procured for its aircraft, on an ad hoe basis, numerous repair, maintenance, and servicing items at such places as San Diego, Bakersfield, Stockton, Tucson, Chicago, St. Louis, Houston, San Antonio, Dallas, and Lubbock; that the plaintiff was aware at the time that such work was being performed on the Service’s aircraft; and that the plaintiff did not object on the ground — and does not now contend — that such procurements by the Service at places other than El Paso from persons other than the plaintiff violated the 1969 contract.
For the reasons previously stated, it is my opinion that the Service did not violate the 1969 contract when it procured from Ken Bemis Aircraft Service at El Centro, California, the routine daily and preflight inspections which the Service’s aircraft required during the 5-day details to El Centro. It necessarily follows that the plaintiff’s petition should be dismissed.
Findings oe Fact
1. (a) The plaintiff is a corporation, duly incorporated under the laws of the State of Texas. It maintains its principal place of business in Brownsville, Texas.
*306 (b) The plaintiff’s business is the inspection, repair, overhaul, modification, refurbishing, and servicing of aircraft that weigh 12,500 pounds or more.
(c) The plaintiff operates a facility at Brownsville, Texas, and another facility at El Paso, Texas. Both of these facilities are FAA certified repair stations.
(d) One of the services which the plaintiff is qualified and equipped to perform, both at Brownsville and at El Paso, is commonly referred to as the “routine daily and preflight inspection” which every passenger-carrying aircraft is required by the Federal Aviation Regulations to receive from qualified personnel within the 24-hour period immediately preceding any take-off for a flight. The purpose is to determine the airworthiness of the aircraft. In the conduct of such inspections, there are, on most occasions, repairs or other services to the aircraf t which are related to, or accomplished as incidents to, the inspections by the personnel conducting such inspections (and for which additional charges are made if the inspections and related work are performed by private concerns).
(e) The plaintiff has had several annual contracts with the U.S. Navy and with the U.S. Air Force for the performance of work on military aircraft at the plaintiff’s Brownsville station, and it has also had a contract with the U.S. Air Force for the performance of work on military aircraft at the plaintiff’s El Paso station. In addition, the plaintiff has had a contract with the West German Air Force for the performance of work on its military aircraft at the plaintiff’s El Paso station.
2. The Immigration and Naturalization Service (“the Service”) of the U.S. Department of Justice is an agency of the defendant.
3. (a) Beginning in the early 1960’s and extending through the fiscal year 1967, large numbers of Mexican aliens illegally entered the United States across the Rio Grande River in order to work on the citrus fruit, vegetable, melon, and cotton farms located in the lower Rio Grande Valley of Texas. Many of these illegal immigrants, after working for a time in the lower Rio Grande Valley, moved into the in *307 terior of the United States, particularly to mid-western cities such as Chicago, in search of other work. When illegal immigrants from Mexico were apprehended at points in the mid-west during the period just mentioned, the Service generally assembled them in major cities of the region, particularly Chicago, for return to Mexico. For a time, the transportation of the illegal Mexican immigrants from Chicago and other mid-western cities to tne Texas-Mexico border for return to Mexico was accomplished by the Service through the use of railroad trains in what was referred to as a train-lift.
(b) During the fiscal years 1966 and 1967, however, the transportation of illegal Mexican immigrants from Chicago and other mid-western cities to the Texas-Mexico border for return to Mexico was accomplished by the Service principally through the use of a fleet of Service-operated aircraft. These aircraft and their crews were assigned to the Southwest Region of the Service and were based at Brownsville, Texas. Brownsville was the customary destination of the flights from the mid-west bearing illegal immigrants for expulsion to Mexico. From Brownsville, the illegal immigrants were usually moved by bus to nearby Port Isabel, Texas, and from that point they were transported to locations in Mexico, principally by means of a boat-lift.
(c) The Service-operated fleet of aircraft based at Brownsville, Texas, in the fiscal year 1966 consisted of three DC-3’s, a DC-4, a DC-6B, two C-46’s, and two Convair 340-440’s. In the fiscal year 1967, however, the fleet was reduced to a DC-3, a DC-4, a DC-6B, and two Convair 340-440’s.
4. (a) On the basis of competitive bidding, the Service entered into successive contracts (SW-9-66 and SW-7-67) with the plaintiff for the fiscal years 1966 and 1967, covering the repair, maintenance, servicing, and inspection at Brownsville, Texas, of Service-operated aircraft.
(b) The Brownsville contract between the Service and the plaintiff for the fiscal year 1967 was numbered SW-7-67. Its provisions were similar to the provisions of the contract between the parties for the fiscal year 1966.
*308 (c) The 1967 Brownsville contract covered the “repair, maintenance (including overhaul and modification), servicing and inspection of Government-owned aircraft and components at Brownsville, Texas, during the period July 1,1966 through June 30, 1967.” It required the plaintiff to “Furnish * * * all labor, parts, material, tools, fixtures, to overhaul, modify and/or inspect as required * * * approximately five * * * aircraft * * The contract prescribed hourly rates for different types of work to be performed under the contract. Parts were provided by the plaintiff to the Service under the contract at the plaintiff’s acquisition cost.
(d) The aircraft covered by the 1967 Brownsville contract were a DC45, a DC-4, a DC-6B, and two Convair 340-440’s. (The 1966 Brownsville contract covered a DC4:, three DC-3’s, a DC-6B, two C-46’s, and two Convair 340-440’s.)
(e) Paragraph 1 of the special conditions set out in the 1967 Brownsville contract provided as follows:
Material and services required under this contract are intended primarily for completion or accomplishment at the based operational location of the aircraft. However, in the event of emergent necessity, and such necessity shall be for the determination of the contracting officer or 'his designated representative, the contractor shall provide necessary and qualified technical personnel and equipment to effect such repairs as may be necessary at locations other than the based location of operations. Transportation and necessary expenses in connection with the movement of such personnel and equipment shall be for the account of the Government. However, such expenses shall not exceed the applicable amounts or rates established in “Standardized Government Travel Regulations”, Government Printing Office publication, revised effective March 1, 1965, as amended. All such expenses necessarily incurred shall be borne by the contractor and subsequently billed to the Government in the normal billing manner.
(f)Paragraph 2 of the special conditions of the 1967 Brownsville contract was entitled “Quantities” and stated as follows:
This is an indefinite quantity contract, no definite amount of repair or maintenance being implied or guar *309 anteed. However, approximately 2,000 to 3,000 man 'hours per month are expected to be required. The fleet of aircraft is expected to be flown approximately 375 hours monthly.
(g) Paragraph 16 of the special conditions of the 1967 Brownsville contract was entitled “Aircraft Overhaul and Repair Limitations” and stated as follows:
The Government reserve's the right to limit the extent of repair or overhaul of any aircraft to minor category requirements and to solicit competitively from any or all licensed or certiflcated repair or overhaul facilities such major requirements determined by the contracting officer or his designated representative "to be within the better interests of the Government.
(h) In addition to the Brownsville contracts for the fiscal years 1966 and 1967 referred to in the preceding paragraphs of this finding, the Service and the plaintiff, on the basis of competitive bidding, also entered into contracts for the fiscal years 1966 and 1967 under which the plaintiff performed for the Service “In-transit inspection of Government-owned aircraft and components” at El Paso, Texas, during the respective fiscal years. These contracts were numbered SW-30-66 and SW-8-67.
5. During the first half of the fiscal year 1968, the Service continued to operate a fleet of Brownsville-based aircraft. The fleet consisted of a DC-3, a DC-4, a DC-6A, and two Convair 340-440’s.
6. During the fiscal years 1966 and 1967, and through the first half of the fiscal year 1968, the plaintiff maintained at its Brownsville, Texas, station a special work-force that was assigned to work on Service-operated aircraft. This work-force included some of the most competent mechanics in the plaintiff’s employ.
7. (a) Sometime during the fiscal year 1967, one of the Convair 340-440’s from the Service’s fleet of aircraft based at Brownsville, Texas, was assigned, with its crew, to the headquarters of the Service in Washington, D.C., for an extended period of time. During the extended absence of this aircraft from Brownsville, the routine daily and preflight *310 inspections, as well as other repair and maintenance work, on such aircraft were performed at repair stations operated in or near Washington, D.C., by firms other than the plaintiff.
(b) The absence from Brownville of the aircraft mentioned in paragraph (a) of this finding created a difficult problem for the plaintiff with respect to the utilization of the special work-force which the plaintiff had been maintaining, and continued to maintain, at its Brownsville station to work on Service-operated aircraft (see finding 6). This work-force was not fully occupied in the performance of work on the Service-operated aircraft that remained in Brownsville. The plaintiff endeavored to integrate members of such work-force into a program in which the plaintiff was then engaged and which involved the overhaul of aircraft for the U.S. Navy, but that was a production-type program and workmen could not readily be transferred into it or out of it. This problem was discussed by the plaintiff’s top management, and there was uncertainty among the group as to whether it would be advisable for the plaintiff to enter into a new contract with the Service for the fiscal year 1968 similar to the Brownsville contract for 1967 unless the plaintiff could obtain some sort of guarantee or assurance of continuous work under the contract.
(c) [Representatives of the plaintiff discussed with representatives of the defendant the problem referred to in paragraph (b) of this finding, and indicated that there was doubt as to whether the plaintiff would be willing to enter into a new contract for the fiscal year 1968 similar to the Brownsville contract for 1967 unless some sort of guarantee or assurance could be obtained that the Service-operated aircraft would operate regularly out of Brownsville during the next fiscal year, and not be assigned to some other place for an extended period, thus interrupting the steady flow of work to the plaintiff under the contract. Representatives of the plaintiff did not suggest any language that the plaintiff would like to have inserted in a contract for the fiscal year 1968 to provide the desired guarantee or assurance. Representatives of the Service took the position that the Service was unable to provide any type of guarantee or assurance with respect to *311 the volume of work, because the Service had no control over how much its aircraft would fly, or where its aircraft would fly, or where passengers needing transportation from Service-operated aircraft would be located at any particular point in time.
8. When the Service sent out its invitation for bids on a contract for the- fiscal year 1968, as indicated in finding 9, the plaintiff decided to submit a bid, and such bid was successful.
9. (a) On the basis of competitive bidding, the Service entered into a contract with the plaintiff on June 29,1967, for the repair, etc., at Brownsville, Texas, of Service-operated aircraft during the fiscal year 1968.
(b) The 1968 Brownsville contract was numbered SW-11-68. It covered the “repair, maintenance (including overhaul and modification), servicing and inspection of Government-owned aircraft and components at Brownsville, Texas”; and it required the plaintiff to “Furnish * * * all labor, parts, material, tools and fixtures to repair, service, overhaul, modify and/or inspect as required * * * approximately five * * * aircraft * * *.” The 1968 Brownsville contract differed from the 1967 Brownsville contract in the following respects:
(1) The aircraft covered by the 1968 Brownsville contract did not include a DC-6B but did include a DC-6A.
(2) Paragraph 1 of the special conditions of the 1968 Brownsville contract expressly referred to Brownsville, Texas, as the based operational location of the aircraft. (See finding 4(e).)
(3) Paragraph 2 of the special conditions of the 1968 Brownsville contract was entitled “Quantities” and provided as follow:
This is an indefinite quantity contract, no definite amount of repair or maintenance being implied or guaranteed. The Government will place orders periodically during the term of this contract as the need arises. The fleet of aircraft is expected to be flown approximately 468 hours monthly.
The bidder, whose proposal is accepted, will be required to furnish any or all services and/or supplies, in *312 accordance with the specifications and at the unit prices indicated therein, when such service and/or supplies are authorized or requested by the Contracting Officer’s Representative. It is understood and agreed that the Government will order from the contractor all of such services and/or supplies called for in this contract, as there may be need for, during the contract period. It is further understood and agreed that in the event either that no need arises for any of such services and/or supplies or there exists a desire to order such services and/or supplies from another Government agency then the Government shall not be held liable for failure to secure same under this contract. This contract excludes the overhaul of Pratt & Whitney engines Model Nos. R-2000 and R-2800, and conducting Intransit Inspection on aircraft while based at El Paso, Texas.
(4) The special conditions of the 1968 Brownsville contract did not contain a provision similar to that quoted in finding 4(g).
(c) In addition to the Brownsville contract SW-11-68 mentioned in the preceding paragraphs of this finding, the Service and the plaintiff, on the basis of competitive bidding, also entered into a contract (SW-12-68) for the fiscal year 1968 under which the plaintiff was to perform for the Service “Intransit, daily and proflight inspection of Government-owned aircraft and components at El Paso, Texas, during the period July 1, 1967, through June 30, 1968.”
10. The new language in the “Quantities” paragraph of the 1968 Brownsville contract (see finding 9(b)(3)), as compared with the language in the 1967 Brownsville contract (see finding 4(f)), was inserted by the Service because of a belief on the part of the Service that the contract should contain a clearer, more complete, and more binding statement on the subject of consideration. The inclusion of the new language was not induced by — and was unrelated to — - the plaintiff’s desire for a guarantee or assurance with respect to a steady volume of work under the contract (see finding 7).
11. (a) By the middle of the fiscal year 1968, the number of aliens illegally entering the United States across the Rio Grande River, and the number of illegal Mexican immigrants apprehended in Chicago and other mid-western cities for re *313 turn to Mexico, bad greatly dwindled in comparison with the situation that had prevailed in previous years. Farm work in the lower Rio Grande Yalley of Texas was no longer as attractive to illegal Mexican immigrants as farm work in Arizona and Southern California, where the wages were higher than those paid in the lower Rio Grande Valley. Consequently, most of the illegal immigrants from Mexico were entering the United States across the Mexico-Arizona and Mexico-California borders by the middle of the fiscal year 1968 and were finding employment in Arizona and Southern California. From these areas, many of the illegal immigrants from Mexico moved into Northern California, Oregon, and Washington, in search of further employment.
(b) Because of the situation described in paragraph (a) of this finding, the Service devised a plan sometime around the middle of the fiscal year 1968 whereby illegal Mexican immigrants apprehended in Arizona, California, Oregon, and Washington would be assembled at San Diego, California, or at El Centro, California, for transportation to El Paso, Texas, from which point they would be returned through Juarez, Mexico, to interior points in Mexico by means of a Mexican-operated airlift, train-lift, or bus-lift.
(c) In order to effectuate the plan outlined in paragraph (b) of this finding, the Service transferred its fleet of aircraft, and their crews, from Brownsville, Texas, to El Paso, Texas, as the new base of operations around the middle of the fiscal year 1968. At the time, the aircraft fleet consisted of a DC-6A and two Convair 340-440’s. After being based at El Paso, the aircraft were used principally for the transportation of illegal Mexican immigrants in an air-lift from San Diego, California, and El Centro, California, to El Paso, Texas. This air-lift continued for the remainder of the fiscal year 1968 and into the fiscal year 1969.
12. (a) In January 1968, the Service and the plaintiff entered into a negotiated contract for the period January 15-June 30,1968. It was numbered SW-32-68 NEG.
(b) The negotiated contract of January 1968 covered the “repair, maintenance (including overhaul and modification), servicing and inspection of Government-owned aircraft and *314 components at El Paso, Texas, in strict accordance with the terms, conditions and specifications of this * * * [contract], during the period January 15,1968, through June 80,1968.” It required the plaintiff to “Furnish * * * all labor, parts, material, tools and fixtures to repair, service, overhaul, modify and/or inspect as required * * * approximately three * * * aircraft, during the period January 15, 1968, through June 30,1968.”
(c) The aircraft covered by the negotiated contract of January 1968 consisted of a DC-6A (N-2816-J, with a 97-passenger capacity) and two Convair 340-440’s (N-1179, with a 44-passenger capacity, and N-2806-J, with a 50-passenger capacity).
(d) The negotiated contract of January 1968 specified hourly rates to be paid by the Service to the plaintiff for various types of work that were to be performed under the contract. Parts were to be provided by the plaintiff at its acquisition cost.
(e) The negotiated contract of January 1968 differed from the 1968 Brownsville contract in the following respects:
(1) In the “Quantities” paragraph of the special conditions of the negotiated contract of January 1968, the figure “400” was used instead of “468” in the third sentence, the word “offeror” was used instead of the word “bidder” in the fourth sentence, and the final sentence of the “Quantities” paragraph in the 1968 Brownsville contract, excluding the overhaul of Pratt & Whitney engines (see finding 9 (b) (3)), was omitted from the January 1968 negotiated contract.
(2) The negotiated contract of January 1968 did not contain a provision requiring the plaintiff to perform emergency work at locations other than El Paso, Texas. (See finding 4 (e) and finding 9 (b) (2).)
13. (a) On May 29, 1968, the Service and the plaintiff entered into a negotiated contract for the repair, etc., of Service-operated aircraft during the fiscal year 1969. The scope of the 1969 contract was the same as that of the negotiated contract of January 1968 (see finding 12(b)), *315 except that the term of the 1969 contract was “during the period July 1, 1968 through June 30, 1969.” The 1969 contract covered the same aircraft as the negotiated contract of January 1968.
(b) The 1969 contract was numbered SW-1-69-NEG. Like the negotiated contract of January 1968, the 1969 contract prescribed a schedule of hourly rates that were to be paid by the Service to the plaintiff for various types of work performed under the contract, and provided that parts were to be furnished by the plaintiff at its acquisition cost. The plaintiff, without making any additional charge therefor, was to furnish the Service an adequate storage area for Government-owned parts, components, and accessories, was to provide the Service with an approved office area of not less than 660 square feet, and was to maintain the records of the Service-operated aircraft.
(c) The 1969 contract contained a paragraph which was entitled “Location of Repair Facilities” and which required that the plaintiff maintain repair station facilities at El Paso, Texas.
(d) The 1969 contract differed from the negotiated contract of January 1968 in the following respects:
(1) The period covered by the 1969 contract was from July 1,1968, through June 30,1969.
(2) The “Quantities” paragraph of the special conditions of the 1969 contract added at the end the following sentence that was not contained in the similar paragraph of the negotiated contract of January 1968: “This contract excludes the overhaul of Pratt & Witney [sic] Engines Model R-2800.”
(3) The words appearing as “either that” in the penultimate sentence of the “Quantities” paragraph of the 1968 Brownsville contract (see finding 9(b) (3)), and in the final sentence of the “Quantities” paragraph of the negotiated contract of January 1968 (see finding 12(e) (1)), were transposed to “that either” in the “Quantities” paragraph of the 1969 contract.
*316 (4) The special conditions of the 1969 contract contained a paragraph entitled “Emergency Repairs at Other Locations” and providing as follows:
Material and services required under this contract are intended primarily for completion or accomplishment at the based operational location of the aircraft — El Paso, Texas. In the event of emergency necessity determined by contracting officer or his designated representative, the contractor shall provide necessary and qualified technical personnel and equipment to effect such repairs as may be necessary at locations other than those specified. Transportation and necessary expenses in connection with file movement of such personnel and equipment shall be for the account of the Government. However, such expenses shall not exceed the applicable amounts or rates established in “Standardized Government Travel Regulations”, Government Printing Office Publication, revised effective March 1, 1965, as amended. All such expenses necessarily incurred shall be borne by the contractor and subsequently billed to the Government in the normal billing manner.
14. (a) The present litigation arose out of the 1969' contract referred to in finding 13, and involves allegations by the plaintiff that the Service breached such contract.
(b) At all times during the term of the 1969 contract, the plaintiff was willing and able to perform, and did perform, its obligations under such contract.
15. (a) In the negotiations for the 1969 contract, representatives of the plaintiff again pressed strongly for some sort of guarantee or assurance with respect to a steady volume of work under the contract. Representatives of the Service again took the position that they could not provide any such guarantee or assurance. However, representatives of the Service did say that it was their best estimate, on the basis of the information then 'available to the Service, that the Service’s aircraft would continue during the fiscal year 1969 to operate out of El Paso at about the same level — or perhaps at a somewhat increased level — as the operations during the fiscal year 1968.
(b) The plaintiff’s willingness to agree to perform work under the 1969 contract at the schedule of hourly rates set *317 out in the contract was based upon the plaintiff’s expectation that the Service-operated aircraft would be flown approximately 400 hours per month, as estimated by the Service, and that such operations would be conducted out of the Service’s El Paso, Texas, operational base, with the result that the plaintiff’s El Paso station would be called upon to perform most of the repair, etc., work on the several aircraft generated by such operations.
16. The Service decided that there was no need to enter into a contract with the plaintiff for the performance of work on Service-operated aircraft at Brownsville, Texas, during the fiscal year 1969. Although it was anticipated that Service-operated aircraft would fly to Brownsville occasionally during the fiscal year 1969 and might need servicing there, it was thought that such servicing could be obtained for $500 or less on each occasion and, accordingly, that it could be obtained on an ad hoc basis by the pilot in command of any affected aircraft under delegated procurement authority with a $500 limitation, and without the necessity of entering into a formal contract.
17. (a) The Service-operated aircraft referred to in the preceding findings were subject to the requirement that they undergo routine daily and preflight inspections. (See finding 1(d).)
(b) The several contracts between the Service and the plaintiff referred to in the preceding findings included the performance by the plaintiff of routine daily and preflight inspections by the plaintiff on Service-operated aircraft.
18. The provisions of the several contracts between the Service and the plaintiff referred to in previous findings were drafted by the Service.
19. (a) The air-lift from San Diego, California, and El Centro, California, to El Paso, Texas, as described in finding 11(c), turned out to be financially very burdensome to the Service, in the light of the funds available to it for the fiscal year 1969. As a means of saving expenses, the Service discontinued this air-lift at about the beginning of September 1968 and substituted for it a bus-lift, which involved the transportation of illegal Mexican immigrants in Service- *318 operated buses from points in Arizona, California, and the Pacific Northwest to Andrade, California, where the illegal immigrants were transferred to buses operated by a Mexican company for transportation into the interior of Mexico. The bus-lift was continued throughout the remainder of the fiscal year 1969 (and up until the time of the trial in June 1971).
(b) As a result of the discontinuance of the air-lift from San Diego, California, and El Centro, California, to El Paso, Texas, there was no longer any great need during the remainder of the fiscal year 1969 for the Service-operated aircraft on passenger-carrying flights to or from El Paso, Texas, and such aircraft and their crews were idle much of the time. This adversely affected the amount of work that the plaintiff would otherwise have been called upon to perform at El Paso on Service-operated aircraft under the contract for the fiscal year 1969.
20. (a) The number of illegal Mexican immigrants apprehended in Northern California and in the Pacific Northwest proved to be too great for the Service-operated bus-lift to be able to handle their transportation to the Mexican border with reasonable expedition. As a consequence, the Service adopted a plan in September 1968 whereby, for the remainder of the fiscal year 1969, the two Convair 340-440’s and their crews were, with substantial regularity, detailed on a rotating basis from El Paso, Texas, to El Centro, California, for the purpose of supplementing the bus-lift. A Convair 340-440 and its crew would leave El Paso, Texas, on a Monday morning and would proceed to El Centro, California, on a detail lasting through Friday of the particular week. The aircraft would operate during the 5-day detail out of the El Centro Naval Air Station and would be used in the transportation of illegal Mexican immigrants from points in Northern California and the Pacific Northwest to El Centro, from which place the illegal immigrants were transported in Service-operated buses to Andrade, California, for transfer to Mexican-operated buses so that they could be transported into the interior of Mexico. The members of the aircraft crew were in a travel status, and received a per diem allowance in lieu of subsistence, during the 5-day detail. At *319 the end of the 5-day detail, the crew would fly the aircraft 'back to El Paso. Then, on the following Monday, the other Convair 340-440 and its crew would generally be detailed from El Paso, Texas, to El Centro, California, for a 5-day period.
(b) On a few occasions, when its greater carrying capacity was needed for the transportation of illegal Mexican immigrants from Northern California or the Pacific Northwest to El Centro, California, the Service-operated DC-6A and its crew were temporarily detailed from El Paso, Texas, to El Centro, California.
(c) During the 5-day details of Service-operated aircraft from El Paso, Texas, to El Centro, California, as outlined in paragraphs (a) and (b) of this finding, it was necessary for such aircraft to obtain routine daily and pre-flight inspections, since a passenger-carrying aircraft must receive such an inspection from qualified personnel within the 24-hour period immediately preceding any takeoff on a flight. Such inspections were obtained by the Service from Ken Bemis Aircraft Service in El Centro, California, a non-governmental private firm with which the plaintiff had no connection.
21. (a) During the period September-June of the fiscal year 1969, the Ken Bemis Aircraft Service performed 129 routine daily and preflight inspections on Service-operated aircraft at El Centro, California. On each occasion, these services were obtained on an ad hoc basis by the pilot in command of the affected aircraft, utilizing for this purpose delegated authority to procure needed goods and services which cost $500 or less, without entering into a formal written contract.
(b) The Service paid Ken Bemis Aircraft Service a total of $14,461.46 for services performed during the fiscal year 1969.
(c) The Service’s actions in obtaining routine daily and preflight inspections from Ken Bemis Aircraft Service during the fiscal year 1969, as mentioned in paragraph (a) of this finding, constituted the bases for the allegations in the petition that the defendant breached the 1969 contract between the parties.
*320 22. During the fiscal year 1969, five routine daily and pre-flight inspections were performed by the plaintiff’s Brownsville station on Service-operated aircraft. These services were not regarded by the plaintiff or by the Service as being within the scope of the 1969 contract referred to in finding 13. On each occasion, such services were obtained on an ad hoe basis by the pilot in command of the affected aircraft, utilizing for this purpose delegated authority to procure needed goods and services which cost $500 or less, without entering into a formal written contract. The Service paid the plaintiff a total of $1,276.25 for the services performed by the plaintiff’s Brownsville station during the fiscal year 1969.
23. During the fiscal year 1969, the Service obtained from the plaintiff’s station at El Paso, Texas, all the repair, maintenance (including overhaul and modification), servicing, and inspection work (including all the routine daily and preflight inspections) needed at El Paso, Texas, on Service-operated aircraft.
24. (a) In a telephone conference that was held in October 1968 between representatives of the plaintiff and officials of the Southwest Region of the Service, the plaintiff’s representatives referred to the routine daily and preflight inspections that were being performed on Service-operated aircraft at El Centro, California, by Ken Bemis Aircraft Service, and expressed the opinion that the 1969 contract was being violated by the Service. The plaintiff’s representatives took the position in the telephone conference that a Service-operated aircraft, even though detailed to El Centro, California, should return to El Paso, Texas, each day in order that it might be given a routine daily and preflight inspection by the plaintiff under the 1969 contract. The plaintiff’s representatives stated that they were not registering a formal complaint, but wanted to know how long the practice was going to continue, and if they could get it stopped. Representatives of the defendant expressed the view that the procuring of routine daily and preflight inspections from Ken Bemis Aircraft Service while Service-operated aircraft were detailed to El Centro, California, did not breach *321 the 1969 contract, but stated that the matter would be die cussed within the Service.
(b) Further telephone conferences were held between representatives of the plaintiff and representatives of the Service on or about November 17,1968, on or about December 2,1968, and on or about January 6,1969. In all of these conferences, representatives of the plaintiff continued to assert the view that the Service was violating the 1969 contract by having routine daily and preflight inspections performed on Service-operated aircraft by Ken Bemis Aircraft Service at El Centro, California, while representatives of the Service contended that the 1969 contract was not being violated.
(c) A meeting on the subject of the alleged breaches of the 1969 contract by the Service was held on or about January 30, 1969, between representatives of the plaintiff and representatives of the Service. Kepresentatives of the Service still adhered to the view that the 1969 contract was not being violated by the Service, but indicated that if the plaintiff were to file a formal claim, it would receive consideration.
25. (a) By means of a letter dated February 20,1969, the plaintiff submitted to the contracting officer a claim under the 1969 contract for an equitable adjustment in the amount of $15,239 for the period from September 20, 1968, through January 2, 1969. In this letter, the plaintiff expressed the view that the defendant had changed the scope of the 1969 contract, and that this should be recognized by the defendant through the issuance of a change order effecting an equitable adjustment. The plaintiff’s letter stated in part as follows:
Contractor’s loss, by virtue of the government’s actions in this regard, requires that an adjustment be made. Insofar as amounts to be considered in such adjustment, the information which Contractor presently has, covering the period September 20, 1968, through January 2, 1969, indicates a total of 49 Daily and Pre-Flight services performed in California, while the involved aircraft were in that area. Contractor had no notice of this, except as is indicated in the daily logs of the aircraft involved. During this same period, Contractor found it necessary to maintain additional employees on a payroll, in order *322 to meet its contractual obligation of service hours. During the above stated period, the necessary equitable adjustment would amount to $15,239.00. This amount is computed based upon the number of Daily and Pre-Flight services rendered Aircraft Nos. N1179 and N2806J by private sources other than Contractor (in non-emergency situations) during the period September 20, 1968., through January 2,1969, multiplied by the average invoice price for Daily and Pre-Flight services performed by Contractor during this same period on said aircraft.
(b) In a letter dated April 16,1969, and addressed to the contracting officer, the plaintiff supplemented its claim of February 20, 1969, by asking for the additional amount of $7,662 for the period from January 2, 1969, through March 31,1969. Thus, the total amount claimed by the plaintiff up to and including March 31, 1969, was $22,901.
(c) On April 25,1969, the contracting officer informed the plaintiff that its claim was denied.
(d) On May 9, 1969, the plaintiff wrote the contracting officer and increased its claim by the amount of $10,772 with respect to the month of April 1969. The plaintiff stated in this letter that the total amount of this claim from the period September 20,1968, through April 30,1969, was $33,673.
(e) The contracting officer on May 14,1969, acknowledged the plaintiff’s letter of May 9,1969, and stated that this supplement to the plaintiff’s claim was covered by the contracting officer’s decision of April 25,1969, denying the plaintiff’s claim.
(f) On May 26, 1969, the plaintiff took an appeal to the Commissioner of the Immigration and Naturalization Service from the contracting officer’s rejection of its claim.
(g) In a letter dated July 8, 1969, and addressed to the plaintiff, the Associate Commissioner, Management, of the Immigration and Naturalization Service informed the plaintiff that the denial of its claim by the contracting officer was sustained. This letter concluded with the following paragraph:
Further recourse in this matter may be had with the United States General Accounting Office or with the United States Court of Claims.
*323 26. The plaintiff’s petition was filed in this court on January 9,1970.
27. (a) For the period July 1, 1967-June 30, 1968, the plaintiff was contractually responsible for maintaining — and did in fact maintain — the log books for the defendant’s aircraft N-2816-J, N-1179, and N-2806-J.
(b) The log books for the aircraft referred to in paragraph (a) of this finding show that during the period July 1,1967-June 30, 1968, no servicing, maintenance, or repairs were performed on such aircraft at either Brownsville, Texas, or El Paso, Texas, by any non-governmental private firm other than the plaintiff.
(c) The log books for the aircraft referred to in paragraph (a) of this finding show that during the period July 1, 1967-June 30,1968, such aircraft received some servicing or repairs — but no routine daily and preflight inspections — from non-governmental private firms other than the plaintiff at places other than Brownsville, Texas, and El Paso, Texas, at a total cost of $4,671.08. The plaintiff was aware at the time that the Service-operated aircraft were receiving such servicing or repairs, but the plaintiff has never asserted that such servicing or repairs by other firms breached the Brownsville 1968 contract (see finding 9) or the negotiated contract of January 1968 (see finding 12).
28. (a) In addition to the work that was performed on Service-operated aircraft during the fiscal year 1969 by the plaintiff’s station at El Paso, Texas, under the 1969 contract (see finding 13), by Ken Bemis Aircraft Service at El Centro, California (see findings 20 (c) and 21), and by the plaintiff’s station at Brownsville, Texas (see finding 22), the defendant procured for its aircraft various repair, maintenance, and servicing items (but no routine daily and preflight inspections) , costing a total of $6,919.43, from private firms other than the plaintiff at such places as San Diego, California, Bakersfield, California, Tucson, Arizona, Chicago, Illinois, St. Louis, Missouri, Houston, Texas, Stockton, California, San Antonio, Texas, Lubbock, Texas, and Dallas, Texas. On each occasion, the needed work was obtained on an ad hoo basis by the pilot in command of the affected aircraft.
*324 (b) The plaintiff was aware at the time that the items of work referred to in paragraph (a) of this finding were being procured by the Service for its aircraft.
(c) The plaintiff does not contend that the actions of the Service in procuring the work mentioned in paragraph (a) of this finding constituted breaches of the 1969 contract.
29. The plaintiff is the owner of the claim asserted in the present litigation. Such claim has not been transferred or assigned to any other person.
Conclusion of Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.